LUBIN & ENOCH, P.C.
Nicholas J. Enoch, State Bar No. 016473
Kaitlyn A. Redfield-Ortiz, State Bar No. 030318
Emily A. Tornabene, State Bar No. 030855
349 North Fourth Avenue
Phoenix, Arizona 85003-1505
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
Email: nicholas.enoch@azbar.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marcie A. Redgrave, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>Governor Doug Ducey, in his capacity as Governor of the State of Arizona; Thomas J. Betlach, in his official capacity as Director of the Arizona Health Care Cost Containment System,<br><br>        Defendants. | No.<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

        Plaintiff, Marcie Redgrave ("Redgrave"), by and through her attorneys, Lubin &

Enoch, P.C., brings this collective action pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 206, on behalf of herself and all others similarly situated.

Attached hereto is Ms. Redgrave's Opt-In form, as required by 29 U.S.C. § 216(b).

## **Introduction**

        1.      Redgrave is a current employee of the Division of Developmental

Disabilities ("DDD"), a state agency within Defendant agency, the Arizona Health Care

Cost Containment System ("AHCCCS").

2.      Redgrave is one of over 1,900 Independent Providers[1] employed by Defendants, who personally deliver in-home health and personal care services to approximately 35,000 developmentally disabled Arizonans.

3.      Defendants pay Independent Providers on an hourly basis.

4.      For the past nineteen years, Redgrave has provided in-home care to P.L., who suffers from cerebral palsy, in their shared home.

5.      During this time, Redgrave has worked between sixteen and twenty-four hours per day for seven days per week.  Due to the severity of his condition, P.L. requires significant "hands-on" attendant care, as well as supervisory care.

6.      Despite being fully aware of how much Redgrave actually works, Defendants have willfully paid her for less than half of her hours worked and have refused to pay her overtime.

7.      Redgrave alleges on behalf of herself and all other similarly-situated Independent Providers that Defendants have unlawfully failed and refused to pay them minimum wage for all hours worked and overtime pay for hours worked over forty per week, in violation of the FLSA.  Redgrave and members of the putative collective action are not exempt from the FLSA.

## **Jurisdiction and Venue**

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States.

---

[1]     *See* https://des.az.gov/sites/default/files/altcs_overview_utilization.pdf (last accessed July 17, 2017).

1

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the parties are located here and the events that gave rise to this complaint occurred in this district.

### The Named Plaintiff

10.     For nineteen years, Redgrave has provided live-in care for P.L., who suffers from cerebral palsy.  Redgrave and P.L. have lived together in several states.  They moved to Arizona in 2010.  Redgrave is not related to P.L.

11.     Redgrave and P.L. resided in Pima County until April 3, 2017, when they relocated to Maricopa County, where they currently live.  Redgrave and P.L. share the cost of their mutual home.

12.     Redgrave and other similarly situated Independent Providers are or were employees of Defendants as defined in 29 U.S.C. § 203(e)(2).

13.     Independent Providers are certified in a number of care types, including Attendant Care, Habilitation, Homemaking, and Respite Care.

14.     Redgrave is certified in Attendant Care.  *See* **Exhibit 1.**

15.     Pursuant to 29 U.S.C. § 216(b), Redgrave requests that this action be granted collective action status.  Redgrave seeks to represent all other similarly situated Independent Providers who, at any point between August 18, 2014 and the present date, worked for Defendants and who were not paid the requisite minimum wage and overtime compensation.

**Defendants**

16.     Defendants are Doug Ducey, in his official capacity as Governor of the State of Arizona, and Thomas J. Betlach, in his official capacity as Director of the Arizona Health Care Cost Containment System.

17.     Doug Ducey is the Governor of the State of Arizona and is responsible for supervision of the executive department.  Ariz. Const., Art. 5, §§ 1, 4.

18.     Thomas J. Betlach is the Director of the Arizona Health Care Cost Containment System ("AHCCCS") and is responsible for administering that program.  He was appointed Director by former Governor Jan Brewer pursuant to A.R.S. § 36-2902.

19.     The Arizona Health Care Cost Containment System ("AHCCCS") receives and distributes federal Medicaid funds to eligible Arizonans.

20.     AHCCCS provides Medicaid long-term care benefits to disabled persons through the Arizona Long-Term Care System ("ALTCS").

21.     ALTCS provides institutional services, home- and community-based services, acute care, case management, and behavioral health services to eligible persons. The elderly, physically disabled, and developmentally disabled are eligible for ALTCS if they pass both a financial and medical screening.  ALTCS beneficiaries are known as "Members."

22.     ALTCS services are delivered through Managed Care Organizations, which receive AHCCCS funds for each Member that they serve.

23.     Three Managed Care Organizations, including Bridgeway Health Solutions, UnitedHealthcare Community Plan, and Mercy Care Plan, serve ALTCS' elderly and physically disabled populations.

24.     The Managed Care Organization serving developmentally disabled ALTCS Members is a state agency, the Division of Developmental Disabilities ("DDD"), which is housed within the Arizona Department of Economic Security ("DES").

25.     The DDD and the three other Managed Care Organizations contract with Qualified Vendors, which are agencies that employ individuals to provide direct care services, including in-home attendant care, to Members.

26.     In addition to contracting with these agencies, the DDD also directly hires individuals, known as "Independent Providers," like Redgrave, to deliver services.

27.     The DDD operates a Member-directed service delivery option, known as "Agency with Choice," through which Members and the DDD share decision-making authority over some aspects of the Member's services, including choosing, managing, and firing the Independent Providers who work and live in Members' homes.  *See* **Exhibit 2.**

28.     The DDD contracts with Public Partnerships, LLC for financial management services, including issuing paychecks to Independent Providers.

**FLSA Collective Action Allegations**

29.     Redgrave alleges violations of the FLSA on behalf of all persons who were employed by Defendants at any point between August 18, 2014 and the present date, and who were not compensated at the minimum wage for all hours worked until forty per week, and at one-and-one-half times the regular rate for all hours worked over forty per week.

30.     Redgrave and the Independent Providers she seeks to represent are similarly situated, were required to sign substantially similar Independent Provider agreements, and were all refused overtime pay by Defendants.  The Independent Providers she seeks to

4

represent are also subject to Defendants' common practice of under-assessing the number of hours of care required by their Members.  This practice ensures that Defendants pay Independent Providers for less than the actual number of hours that they work, causing their pay to fall below the federal minimum wage.

31.     Redgrave requests that she be permitted to serve as representative of Independent Providers who will later consent to participate in this action and that this action be granted collective action status pursuant to 29 U.S.C. § 216(b).

32.     The names and addresses of the prospective collective action members are available through Defendants.  Notice will be provided to the prospective collective action members via first class mail and/or by use of techniques in a form of notice that has been customarily used in class actions, subject to court approval.

## Redgrave's Job Responsibilities

33.     Redgrave lives with P.L. because he requires around-the-clock care due to the severity of his condition. Even when not directly engaged in P.L.'s care, Redgrave is always present and on-call because his needs arise constantly.  Leaving P.L. is always a health risk, so she does so rarely and for no longer than one hour at a time.  Redgrave leaves only to buy groceries, deliver a rent check, or pick up P.L.'s medications.

34.     The DDD defines Redgrave's responsibilities in its Service Specification for Attendant Care, attached here as **Exhibit 3.**  Attendant Care Providers' total devotion to meeting an enormous range of needs is a large part of what allows 99% of developmentally disabled Arizonans to live at home, rather than in institutions.[2]  The

---

[2]     *See* https://des.az.gov/services/disabilities/developmental-child-and-adult/welcome-developmental-disabilities (last accessed July 14, 2017).

DDD requires Attendant Care Providers to meet Members' "essential personal, physical, and homemaking needs.  This ability includes social, physical, and emotional fitness."  *See* **Exhibit 3, p. 6.**

35.     Specifically, Attendant Care Providers attend to their Member's personal hygiene needs, including bathing, dressing, and toileting.  They prepare all the Member's meals and feed them.  They are responsible for housecleaning, cooking, shopping, assisting with medication, laundry, managing the Member's medical appointments, obtaining transportation, and assisting the Member with daily activities, such as attending church and visiting friends.  They must lift and transfer Members, and move them frequently to prevent bed sores.  Attendant Care Providers must also provide behavioral interventions, and as in Marcie's case, are the primary individuals meeting a Member's social, emotional, and behavioral needs.  Attendant Care Providers are also responsible for monitoring Members' wellbeing and obtaining additional necessary medical and social services.

36.     Redgrave receives almost no time off.  When she attempts to secure a respite care worker, the DDD often reports that it is unable to find someone to fill in.[3]  Alternatively, the DDD sends a respite caregiver who is unqualified to provide the type of care P.L. requires.  Thus, Redgrave is forced to choose between taking time off and

---

[3]     Defendants are the losing party to a lawsuit that traveled up and down the Ninth Circuit multiple times over the last fifteen years.  *See Ball v. Betlach*, No. 4:00-cv-00067-CKJ (D. Ariz.).  The suit alleged that Defendants violated the Federal Medicaid Act by failing to adequately pay Attendant Care Providers, leaving Members with insufficient care.  Members were often left in the lurch because there were too few caregivers to go around, and providers frequently quit or were inadequately qualified.  As a result of the suit, Defendants were forced to make changes to their policies regarding back-up workers.  The problem is evidently unresolved.  *See* **Exhibit 4.**

1  leaving P.L. without a caregiver or with an incompetent caregiver, which would certainly

2  cause him severe harm.  But for a short stint to see her elderly mother, Redgrave has

3  always chosen to stay with P.L.

4        37.     The sheer magnitude of many Members' dependency requires live-in

5  Attendant Care Providers like Redgrave to give their entire lives to the job.

6  **Independent Providers' Pay Structure**

7        38.     Pursuant to Arizona Revised Statutes §§ 36-2959 and 36-557(M),

8  Defendants undergo an annual process to set an hourly reimbursement rate for

9  Independent Providers.  These rates are published annually.  The DDD establishes a

10  "Benchmark Rate," or one that it considers to be "fair and equitable," and then adopts a

11  lower "Adopted Rate," based on its budgetary restrictions. [4]

12        39.     The rate paid to Independent Care Providers is lower than that paid to

13  agencies, known as Qualified Vendors, who hire workers to perform exactly the same job

14  under better working conditions.  The DDD explains that Independent Providers' rates are

15  "generally lower than the agency rates because of a reduction for employee-related

16  expenses and administrative overhead, as well as a general cap at the agency rate."  ***See***

17  **Exhibit 5, p. 173.**

18        40.     Nevertheless, the DDD pays Independent Providers still *less* than the

19  Adopted Rate, because the DDD pays its financial intermediary, Public Partnerships, with

20  a portion of Independent Providers' hourly wages.  For instance, in December 2015, the

21

22

23  [4]    *See* https://des.az.gov/sites/default/files/media/RateBook-Rate-Schedules_20170101_0.pdf (last accessed August 7, 2017).

24  7

maximum Adopted Rate for Independent Providers providing attendant care, like Redgrave, was $13.84, but Redgrave earned only $11.70 per hour.  *See* **Exhibit 6.**

41.     Currently, Redgrave is paid $12.12 per hour.  *See* **Exhibit 7.**

## Redgrave's Hours

42.     Redgrave works around-the-clock.  She spends her entire day meeting P.L.'s physical, medical, hygienic, and behavioral needs.  She wakes at 5am to give P.L. his medication, and works through the day until midnight, at which point she gives P.L. his final medication and attaches his CPAP machine.  Approximately five to six times per week, Redgrave is interrupted during her sleep to empty and clean a catheter bag, clean up after a bowel movement, adjust P.L.'s CPAP, or give him a breathing treatment.

43.     Even when Redgrave is not actively engaged in caring for P.L., she must supervise him.  Because his needs arise erratically and constantly, she cannot leave him for any appreciable length of time.  In fact, Redgrave estimates that, aside from sleeping, she is able to spend only one uninterrupted hour per day on her own individual pursuits.

44.     Upon information and belief, other Independent Providers are also working significantly more than forty hours per week to provide live-in care to high-needs developmentally disabled Arizonans.

45.     Pursuant to federal regulation, "[i]n determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits.  For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must

be of sufficient duration to enable the employee to make effective use of the time.  If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked."  29 C.F.R. § 552.102(a).

46.     Redgrave *never* has complete freedom.  She is P.L.'s only lifeline, providing around-the-clock care and supervision.  She thus works twenty-four hours per day.

47.     The DDD, however, does not appear to have taken into account this federal regulation in determining Redgrave's hours.  The DDD uses its Arizona Independent Rate Assessment Tool ("Assessment Tool") to determine how many hours an Attendant Care Provider may work.  *See* **Exhibit 8.**  The Assessment Tool is administered by the Member's Support Coordinator, who is employed by the DDD.  The Assessment Tool accounts for a Member's characteristics, such as whether he is able to call for help or exhibits unsafe behaviors.

48.     The Assessment Tool endeavors to measure the exact number of minutes required to perform daily services, including meal preparation, feeding, and clean up, dressing and grooming, toileting, housecleaning, laundry, shopping, supervision, transferring, assisting with mobility, and bathing.  *See* **Exhibit 8.**

49.     The total number of hours required to perform all the tasks outlined in the Assessment Tool is the number of hours the DDD authorizes the Independent Provider to work per week.  *See* **Exhibit 8.**

50.     In many cases, Support Coordinators improperly underreport the full number of hours an Independent Provider actually works on the Assessment Tool.  For example, P.L.'s Support Coordinator allotted Redgrave only ten minutes per day to clean the home, and only ten minutes per week to do the shopping.  *See* **Exhibit 8, p. 4-6.**

9

51.     Upon information and belief, Support Coordinators are knowingly improperly under-assessing Members' needs, thereby causing Independent Providers to work many hours without pay and to receive less than the minimum wage for all hours worked.

52.     P.L. has always been a high-needs Member, and during her entire nineteen-year tenure with him, Redgrave has provided at least sixteen hours of active care per day. After he was diagnosed with autonomic disreflexia in 2016, she began providing twenty-four hours per day of supervisory care.

53.     But until October 2016, Redgrave was only paid for fifty-six hours per week, even though at times the Assessment Tool indicated that P.L. needed sixty-three hours of work per week. *See **Exhibits 8 and 6.***

54.     Prior to October 2016, P.L.'s Support Coordinator knowingly under-assessed the amount of care required by P.L., with the specific intent of underpaying Redgrave.

55.     In October 2016, the DDD, through its agent, Lisa Harrison, acknowledged that Redgrave had been working far more hours than she had been paid for and apologized for Defendants' failure to adequately compensate her.  Defendants agreed to double the amount of hours Redgrave could report.  Thus, Redgrave is presently paid for sixteen hours of straight time per day, for seven days per week, at an hourly rate of $12.12. *See **Exhibit 7.***

## FLSA Coverage: Independent Providers are Employees and the DDD is Their Joint Employer

56.     The FLSA requires employers to pay employees a minimum wage for all hours worked.  29 U.S.C. § 206(a).

57.     The FLSA requires employers to pay employees one and one-half times their regular rate for hours worked in excess of forty per week.  29 U.S.C. § 207(a)(1).

58.     Although the DDD sets the wage and provides the funding for Independent Providers, it does not classify Independent Providers as its employees.  The DDD requires Independent Providers, including Redgrave, to sign an Independent Provider Agreement, stating that they are "not an employee of the Division of Developmental Disabilities," and that "the consumer or consumer's representative is the employer of record, or if there is no employer of record, the Applicant is an Independent Contractor."  *See* **Exhibit 9, p. 2.**

59.     Thus, Defendants apparently do not consider themselves bound by the overtime and minimum wage requirements of the FLSA.

60.     That the "consumer," such as P.L., is an Independent Provider's sole employer is a façade.

61.     Defendants and Members jointly employ Independent Providers. Defendants are thus responsible for paying the FLSA-mandated minimum wage and overtime.

62.     In the past, domestic service workers, like Redgrave, were exempt from the FLSA's overtime provisions.  29 U.S.C. § 213(b)(21).

63.     Such is no longer the case.  Now, third-party employers of domestic service employees—meaning the employer other than the individual receiving services—may not claim the live-in domestic service overtime exemption.  Pursuant to 29 C.F.R. § 552.109(c), "[t]hird party employers of employees engaged in live-in domestic service

11

employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual . . . using the services." Live-in Independent Providers fall under this provision because they are live-in domestic service workers within the meaning of § 552.102(a), which provides that "[d]omestic service employees who reside in the household where they are employed are entitled to the same minimum wage as domestic service employees who work by day."

64.     Notably however, an individual receiving services, such as P.L., "even if considered a joint employer, is still entitled to assert the exemption." 29 C.F.R. § 552.109(c).

65.     Thus, a live-in domestic service employee may bring an overtime claim against the agency that employs them, such as the DDD, but not against the individual receiving services, such as P.L., even if the agency and the individual are joint employers.

66.     Thus, if the DDD is found to be Independent Providers' joint employer, it must pay them overtime pursuant to 29 C.F.R. § 552.109(c).

67.     The Department of Labor ("DOL") has concluded that "in most, but not all, consumer-directed models, a third party will be a joint employer of a provider." United States Dep't of Labor, Wage and Hour Division Administrator's Interpretation No. 2014-2 (hereinafter "Interpretation No. 2014-2"), attached hereto as **Exhibit 10**. Depending on the structure of a consumer-directed, Medicaid-funded home care program, "different public entities may be potential employers," and "a state itself, a statewide agency that oversees Medicaid programs, or a county department of aging could all be potential joint

1   employers of home care workers providing services through a consumer-directed

2   program." *Id.*

3        68.    Whether an entity is an employer under the FLSA is governed by the

4   "economic realities test," which examines a number of factors to determine whether a

5   worker is economically dependent upon a purported employer.  *See Goldberg v. Whitaker*

6   *House Cooperative, Inc.*, 366 U.S. 28, 33 (1961); 29 C.F.R. §500.20(h).  Such an

7   assessment requires a weighing of all the facts and circumstances, and there is no single

8   determinative factor.  *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

9        69.    In applying the Economic Realities Test, the Ninth Circuit examines:

10   "whether the alleged employer (1) had the power to hire and fire the employees, (2)

11   supervised and controlled employee work schedules or conditions of employment, (3)

12   determined the rate and method of payment, and (4) maintained employment records."

13   *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).

14        70.    The DOL considers the same factors, and has weighed in on the application

15   of these factors to consumer-directed, Medicaid-funded home healthcare programs in joint

16   employment scenarios.  Interpretation No. 2014-2; *see also* United States Dep't of Labor,

17   Wage and Hour Division Fact Sheet #79E: Joint Employment in Domestic Service

18   Employment Under the Fair Labor Standards Act, attached hereto as **Exhibit11.**  These

19   documents extensively examine the application of the FLSA and associated federal

20   regulations to home healthcare workers employed in a variety of Medicaid-funded

21   programs, like the DDD.

22        71.    Under both the Ninth Circuit's test and the DOL's guidance, the DDD is a

23   joint employer of Independent Providers, and is thus responsible for paying overtime as

24   13

well as minimum wage.  Each of the factors of the Economic Realities Test is analyzed in turn below.

72.   _Power to Hire and Fire_

Generally, the entity with the power to hire and fire is the employer.  The DOL recognizes that in consumer-directed programs, like DDD's Agency with Choice program, "consumers nearly universally retain the right to fire any individual worker from providing services in his or her home at any time" but if "a public entity reserves the right to remove a worker at any time from the household, or can fire a worker for poor performance, then these facts would be strong indicators of employer status." Interpretation No. 2014-2.  Defendants permit Members to fire their caretakers, but Defendants also liberally reserve the right to fire.  Defendants' Independent Provider agreement permits Defendants to terminate the Independent Provider if she no longer meets requisite qualifications, Section 9.6.1; if Defendants determine that the health or welfare or safety of consumers is endangered, Section 9.6.4; or when termination is "in the best interests of the State, without penalty or recourse," Section 9.4.  ***See* Exhibit 9, p. 21-22.**

73.   _Control over Wages_

The power to determine a worker's wages is perhaps the most significant indicator of employer status.  "The Department believes that setting a wage rate is so fundamental to the ultimate question of economic dependence that any entity that sets a wage rate will likely be considered an employer."  Interpretation No. 2014-2.  Thus, it will be "a strong indicator of employer status if a public entity administering a consumer-directed program sets the wage rate for home care workers."  *Id.*  As required by law, the DDD sets the rates

14

for its Independent Providers and reviews them annually.  A.R.S. § 36-557(M); A.R.S. § 36-2959.

The DDD's rate is the sole basis for Independent Providers' pay.  "[I]n the context of home care services in a consumer-directed program in which no private agency or other third party other than a public entity is involved . . . the reimbursement rate for home care workers is essentially what the hourly wage will be and may allow no discretion to set a wage rate."  Interpretation No. 2014-2.  Indeed, pursuant to Section 4.5 of the Independent Provider Agreement and Arizona Administrative Code R9-22-702, home healthcare workers are prohibited from billing the care recipient for AHCCCS-covered services.  Speaking to just this scenario, the DOL has stated that "[i]n this situation, the public entity is exerting considerable, if not complete, control over the amount of money a worker can earn.  These situations, in which the consumer and any private third party do not have any discretion in adjusting the wage earned by the home care worker, should be considered a strong indicator that the public entity is an employee."  Interpretation No. 2014-2.

74.    *Hours and Scheduling*

"If the public entity specifies certain hours or specific weekly schedules to be worked, that fact is a strong indicator that the public entity is an employer."  Interpretation No. 2014-2.  Here, through its Independent Rate Assessment Tool, the DDD prescribes exactly how many minutes Redgrave spends on each task comprising her job—or at least prescribes how many of those minutes she will be paid to work.  ***See* Exhibits 8 and 12.**  And because it has failed to reliably provide Independent Providers with respite care, Defendants require them to work virtually all day, every day.

75.    *Supervises, Directs, or Controls Work*

15

The DOL lists as strong indicators of employment the following: (1) if the public entity mandates the list of specific permissible tasks and the time allocated for performance of each task, (2) if the provider is required to inform both the consumer and the program contact of tardiness or absences, (3) if the program contact intervenes or mediates issues between the consumer and providers, (4) if the program provides for a grievance procedure for workers, (5) if the program conducts regular performance reviews, (6) if the program requires ongoing public-sponsored training, or (7) if the provider must sign in and sign out directly with the public entity.  Interpretation No. 2014-2.

Here, the DDD's Attendant Care Specifications, **see Exhibit 3**, prescribe exactly what tasks Independent Providers must do, and the DDD's Assessment Tool prescribes exactly how many minutes may be spent on each task, ***see* Exhibits 8 and 12**.  Defendants require Attendant Care Workers to report absences and tardiness to both the Member, ***see* Exhibit 13, p. 105**, and to Defendants.  In fact, Defendants require absence reporting because they are bound under *Ball v. Betlach* to ensure that back-up care is available.  ***See* Exhibit 4.**  The DDD has a grievance procedure.  ***See* Exhibit 14.**

The DDD requires Independent Care Providers to "be supervised and monitored."  ***See* Exhibit 3, p. 2.**  Specifically, the DDD conducts one personal on-site supervisory visit within the first 90 days of the hire date, and annually thereafter, and conducts monitoring visits to speak with the Member about the quality of care provided, as needed and no less than every 90 days.  ***See* Exhibit 3, p. 2.**

The DDD requires ongoing public-sponsored training.  ***See* Exhibit 15, p. 9-11.**  In fact, Arizona Administrative Code § R6-6-1520 requires extensive training for Attendant

Care Providers.  "[F]ulfilling comprehensive, state-administered training requirements (beyond training required for relevant licenses), should be considered a strong indicator of employer status."  Interpretation No. 2014-2.  Finally, because Redgrave works in the home, she does not sign in and out directly.

76.     *Performs Payroll and Other Administrative Functions*

The DDD contracts with Public Partnerships, a fiscal intermediary, to provide payroll functions.  The DOL has recognized that functions "similar to the tasks performed by commercial payroll agents for businesses, such as maintaining records, issuing payments, [and] addressing tax withholdings . . . are weak indicators that the entity is an employer."

77.     Thus, each factor of the Economic Realities Test strongly indicates that Defendants are employers of Independent Providers, and that Independent Providers are FLSA-covered employees.

**Defendants are Not Protected by Sovereign Immunity**

78.     Congress wrote the FLSA with the intention of providing coverage to state employees.  Pursuant to 29 U.S.C. § 203(d), "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency."  In turn, "public agency" is defined to include "the government of a State.  29 U.S.C. § 203(x).  An "employee" includes "any individual employed by a State," subject to here-inapplicable exceptions.  29 U.S.C. § 203(e)(2)(b).

79.     In the 1990s, however, the Supreme Court held that Congress lacked power under the Commerce Clause of Article I, the source from which Congress received power to pass the FLSA, to validly abrogate states' immunity and subject them to FLSA suits, in

17

either state or federal court.  *See Seminole Tribe v. Florida*, 517 U.S. 44, 66 (1996); *Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Thus, in many cases, private parties may not sue a state agency.

80.    However, "a state may waive its sovereign immunity and consent to suit." *Seminole Tribe*, 517 U.S. at 65; *Alden*, at 527 U.S. at 737.

81.    The Arizona legislature and Arizona courts have both clearly and emphatically waived absolute sovereign immunity.

82.    The Arizona Legislature waived absolute immunity by enacting the Actions Against Public Entities or Public Employees Act, A.R.S. § 12-820.01.  In so doing, it stated that "[t]he legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity." 1984 Ariz. Sess. Laws, Ch. 285, § 1.

83.    Arizona courts have also found absolute sovereign immunity to be antithetical to the interest of Arizona citizens.  In fact, prior to the codification of Arizona's waiver, A.R.S. § 12-820.01, the Arizona Supreme Court abolished the doctrine, stating that "[m]any inequalities are created through the application of the sovereign immunity doctrine."  *Stone v. Ariz. Highway Comm'n*, 92 Ariz. 384, 392-93 (1963). Several years later, the Court explained further:

> While society may want and need courageous, independent policy decisions among high level government officials, there seems to be no benefit and, indeed, great potential harm in allowing unbridled discretion without fear of being held to account for their actions for every single public official who exercises discretion. The more power bureaucrats exercise over our lives, the more we need some sort of ultimate responsibility to lie for their most outrageous conduct. There may even be some deterrent value in holding officials responsible for shocking outrageous actions.  In any case, democracy by its very definition implies responsibility. *See generally* Laski,

The Responsibility of the State in England, 32 Harv. L. Rev. 447 (1919). In this day of increasing power wielded by governmental officials, absolute immunity for nonjudicial, nonlegislative officials is outmoded and even dangerous.

*Grimm v. Ariz. Bd. of Pardons and Paroles*, 115 Ariz. 260, 266 (Ariz. 1977).

84.     Thus, in Arizona, unlike in some states, where the right to sue the state is a statutory grant, here "the rule is liability and immunity is the exception."  *Stone*, 93 Ariz. at 392.

85.     Arizona's sovereign immunity waiver, codified at A.R.S. § 12-820.01, provides:

A. A public entity shall not be liable for acts and omissions of its employees constituting . . . the exercise of an administrative function involving the determination of fundamental governmental policy.

B. The determination of a fundamental governmental policy involves the exercise of discretion and shall include, but is not limited to:

   1. A determination of whether to seek or whether to provide the resources necessary for any of the following:

        (a)     The purchase of equipment.
        (b)     The construction or maintenance of facilities.
        (c)     The hiring of personnel.
        (d)     The provision of governmental services.

   2. A determination of whether and how to spend existing resources, including those allocated for equipment, facilities and personnel.

86.     Here, P.L.'s Support Coordinator improperly assessed P.L.'s needs on the Arizona Independent Provider Rate Assessment Tool.  Thus, the DDD effectively prohibited Redgrave from reporting her full number of hours, and collecting the appropriate amount of pay.  The Support Coordinator was the DDD employee responsible for Redgrave's unlawful underpayment.

19

87.     The Support Coordinator's decision did not involve "the determination of fundamental governmental policy."  Indeed, no policy was involved.  The decision, made by one low-level state bureaucrat, involved the (erroneous) completion of a pre-made form, and affected only one individual, Redgrave.

88.     If a state employee's "duties are policy-related, they are immune; otherwise, if his duties merely implement policy shaped by the legislature, his actions are not immune."  *Pima County v. State*, 174 Ariz. 402, 405 (Ariz. Ct. App. 1992).  In *Pima*, the court found that the AHCCCS auditor general's audit of a county's health expenditures and establishment of a dollar amount due by each county into the AHCCCS fund was not a fundamental policy decision entitled to sovereign immunity.  The court held that "[w]hile it may well be a complex accounting, this task is a factual, statistical determination involving movement of dollars; it is not an act of legislative policy making."  *Id.*

89.     Here, far fewer people, numbers, and critical decisions are involved than were at stake in *Pima*.  Here, the Support Coordinator's decision was, as in *Pima*, merely a factual determination, involving the allocation of minutes and dollars.

90.     Thus, the Support Coordinator's decision is not entitled to sovereign immunity.  The DDD and the other Defendants are thus responsible for violation of the FLSA with respect to Redgrave and other similarly situated Independent Providers.

**First Claim for Relief**

***Violation of FLSA Overtime Compensation Standard***

91.     Defendants have willfully failed to compensate Redgrave and all other similarly situated Independent Providers for overtime hours worked, as required by 29 U.S.C. § 207 and 29 C.F.R. § 559.109(c).

**Second Claim for Relief**

***Violation of FLSA Minimum Wage Standard***

92.     "In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits.  For periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the employee to make effective use of the time.  If the sleeping time, meal periods or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked."  29 C.F.R. § 552.102(a).

93.     Because of the severity of P.L.'s condition, Redgrave may never freely and safely leave the premises.  She is routinely and regularly called to duty, even during her sleep and meal times.  She provides constant supervision to P.L., even when not actively engaged in his care, and thus never has "complete freedom."  When she leaves to do a quick and necessary errand, she does so at P.L.'s peril.  She is, for all practical purposes, working twenty-four hours per day.

94.     By paying Redgrave and all other similarly situated Independent Providers for less than the full number of hours worked each week, Defendants have willfully failed to pay minimum wages, in violation of 29 C.F.R. § 552.102(a) and 29 U.S.C. § 206.

### Third Claim for Relief

### *Declaratory Relief Pursuant to the Federal Declaratory Judgment Act*

93.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Redgrave seeks a declaration that she and other similarly situated individuals are entitled to be paid for (1) all hours they work, and (2) overtime at one-and-one-half times the regular rate for all hours they work over forty per workweek.

### Prayer for Relief

1.     An award of unpaid overtime for Redgrave and all similarly-situated Independent Providers in an amount appropriate to the proof adduced at trial, pursuant to 29 U.S.C. §§ 207 and 216(b);

2.     An award of unpaid minimum wages for Redgrave and all similarly-situated Independent Providers in an amount appropriate to the proof adduced at trial, pursuant to 29 U.S.C. §§ 206 and 216(b);

3.     An award of liquidated damages for Redgrave and all similarly-situated Independent Providers regarding the two demands above, in an amount appropriate to the proof adduced at trial, pursuant to 29 U.S.C. §§ 206 and 216(b);

4.     Pre-judgment and post-judgment interest on unpaid back wages for Redgrave and all similarly-situated Independent Providers;

5.     A declaratory judgment, pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, and/or 29 U.S.C. § 216;

6.      Attorneys' fees pursuant to 29 U.S.C. § 216(b);

7.      Court costs and costs of litigation pursuant to 29 U.S.C. §216(b); and

8.      Such other and further equitable relief as the Court deems just.

## **Demand for Jury Trial**

Redgrave, on behalf of herself and all others similarly situated, hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 18th day of August, 2017.


                                        LUBIN & ENOCH, P.C.


                                        /s/ Kaitlyn A. Redfield-Ortiz, Esq.
                                        Kaitlyn A. Redfield-Ortiz, Esq.
                                        Attorney for Plaintiffs


## **Certificate of Service**

I hereby certify that on the 18th day of August, 2017, I electronically transmitted the attached Complaint/Notice to the Clerk's Office using the ECF System for filing.

/s/ Stacey L. Lucas




F:\Law Offices\client directory\Redgrave\2017-8-18 (6071-001) Redgrave Complaint.docx

23